## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-3086-KMT

ANTHONY D. SHAPIRO,

Plaintiff,

v.

MARCUS RYNEK,

Defendant.

---

### *AMICUS CURIAE* BRIEF OF CIVIL RIGHTS ORGANIZATIONS AND LAWYERS REGARDING DEFENDANTS' MOTION FOR ATTORNEY'S FEES

---

The undersigned civil rights organizations and lawyers, through counsel Darold W. Killmer and Michael P. Fairhurst of KILLMER, LANE & NEWMAN, LLP, respectfully submit this brief in opposition to the Colorado Attorney General's Motion for Attorney Fees, filed March 10, 2017 [Doc. 229] as *amicus curiae* and interested parties with an interest in the outcome of the issues in dispute. Undersigned *amici* contend that the determination of the Motion for Fees will significantly affect the public interest and the enforcement of constitutional and civil rights in this judicial district and nationally.

Awarding Defendants their attorney's fees in this case would have significant ramifications beyond those for the parties directly involved in this litigation. By seeking attorney's fees from an indigent plaintiff represented by pro bono legal counsel (including supervised law students) pursuant to a request from a federal judge to

undertake such representation, and after his civil rights claim survived summary

judgment and proceeded to a jury trial, Defendants threaten to erode the foundation of

private civil rights enforcement in Colorado and beyond. A ruling from this Court in

the government's favor would create a perilous precedent, weakening and potentially

dismantling the structures Congress built to ensure the law retains the latitude and

incentives in place for plaintiffs to seek redress for violations of their most fundamental

rights, and to pursue good-faith reversal, extension or modifications to existing

constitutional and civil rights law. This Court should reject this aggressive and

oppressive attempt to punish a litigant who brought claims properly through the

judicial process, but merely lost his case.

**1. PRIVATE CIVIL RIGHTS ENFORCEMENT IN COLORADO WILL SUFFER IF THIS COURT AWARDS DEFENDANTS THEIR ATTORNEY'S FEES.**

*Amici* herein are organizations and lawyers dedicated to representing people in

matters implicating fundamental constitutional and civil rights matters.  Most civil

rights litigation occurs in federal court.  Nearly all of these cases involve individual

litigants of common and limited means challenging actions and conduct of

governmental entities and actors.  The disparity in resources between the litigants in

such disputes is enormous, and the challenges faced in prevailing against the

government are often substantial and daunting.  Claimants in such causes are rarely

able to afford legal representation if required to pay on a fee-for-service basis, so it is

necessary to obtain legal counsel on a contingent fee or *pro bono* basis.

### a. Congress Enacted § 1988 to Encourage Citizens to Bring Civil Rights Suits.

Litigants in the United States, traditionally, pay their own attorney's fees. *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 415 (1978); *see also Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1581 (10th Cir. 1995) (applying *Christiansburg Garment* standard to § 1988 attorney's fee claim). Congress enacted 42 U.S.C. § 1988, however, with the express purpose to *encourage* citizens to bring civil rights suits against government officials: "[C]ivil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S. REP. No. 94-1101, at 2-3 (1976), *reprinted in* 1976 U.S.C.A.N. 5908, 5910-11. Our legislators intended the statute "to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R. REP. No. 94-1558, at 1 (1976)).  It is well established that a prevailing civil rights plaintiff is entitled to also collect his attorney's fees. *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1203 (10th Cir. 2000).

There is no equal incentive or policy justification, in contrast, to award attorney's fees to a prevailing defendant in a civil rights case. The plaintiff is the "chosen instrument of Congress to 'vindicate a policy that Congress considered of the highest priority.'" *Christiansburg Garment Co.*, 434 U.S. at 418 (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)). Awarding fees to defendants against

unsuccessful civil rights plaintiffs simply because they lost would "substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement" of civil rights laws. *Id*. at 422; *see also U.S. Steel Corp. v. United States*, 519 F.2d 359, 364 (3d Cir. 1975) ("A prevailing defendant . . . does not appear before the court cloaked in a mantle of public interest."). Congress has cautioned that "'private attorneys general' should not be deterred from bringing good faith actions to vindicate . . . fundamental rights . . . by the prospect of having to pay their opponent's counsel fees should they lose." S. REP. No. 94-1011, at 5 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5912. Moreover, "when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law." *Christiansburg Garment Co.*, at 418-19. The same is "not present in the case of a prevailing defendant." *Id*. at 419 (quotations omitted).

In the absence of such clear private enforcement policy incentives, the only legitimate basis to award attorney's fees to a prevailing defendant under § 1988 is "to protect defendants from burdensome litigation having no legal or factual basis." *Christiansburg Garment Co.*, 434 U.S. at 419-20. Even then, the matter is discretionary. *E.E.O.C. v. St. Louis-San Francisco Ry. Co.*, 743 F.2d 739, 744 (10th Cir. 1984) (citing *Christiansburg Garment Co.*, 434 U.S. at 422). Hence, a prevailing defendant *may be* entitled to attorney's fees only "upon a finding that the plaintiff's action was frivolous, unreasonable, and without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co.*, 434 U.S. at 421; *see also Hughes v. Rowe*, 449 U.S. 5

(1980) (adopting same standard for prevailing § 1983 defendants). *Amici* herein believe that such discretion should be cautiously applied, with sensitive consideration to the ramifications to the enforcement scheme of our civil rights laws, under circumstances such as those present in the instant matter, where *pro bono* counsel is representing an indigent incarcerated plaintiff pursuant to a request from a federal judge for assistance to that indigent inmate upon an initial review of his *pro se* complaint alleging constitutional violations.

### b. An Order Granting Defendants' Motion for Attorney's Fees Will Be Detrimental to Private Civil Rights Enforcement in Colorado.

Seeking attorney's fees against a plaintiff whose case was ultimately adjudicated against him at trial is squarely contrary to congressional intent. Frivolousness is a high bar: Only in "rare circumstances" will "a suit [be] truly frivolous so as to warrant an award of attorneys' fees to the defendant." *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1581 (10th Cir. 1995); *see also Thorpe v. Ancell*, 367 Fed. App'x 914, 920 (10th Cir. 2010) (unpublished) (same). "[E]ven if the law or the facts are somewhat questionable or unfavorable at the outset of litigation, a party may have an entirely reasonable ground for bringing suit," and "[a]llegations that, upon careful examination, prove legally insufficient to require trial are not, for that reason alone, 'groundless' or 'without foundation' as required by *Christiansburg*." *Hughes v. Rowe*, 449 U.S. at 15-16 (1980).

First, as Mr. Shapiro explains extensively in his response to Defendants' motion, his claim was far from frivolous; it survived summary judgment briefing and proceeded

to a jury trial, at which a properly constituted jury found that he had proven that the underlying event which he contended violated his constitutional rights to privacy —the group strip search—had in fact occurred, despite Defendants' arguments to the contrary[1].  If this Court were to find his claim was frivolous, as it would be required to do before awarding attorney's fees under § 1988, it would be sending a message to potential civil rights litigants throughout this jurisdiction "discourag[ing] all but the most airtight claims." *Christiansburg*, 434 U.S. at 421.

Second, a number of learned commentators have described the importance of promoting and practicing public interest law in the United States – an essential societal objective that would be thwarted if Defendants' ill-conceived request for attorney's fees was granted. Respected scholar Professor Nadine Strossen supplies several cogent reasons why courts, law firms, policymakers, educational institutions, and the like should strongly encourage the practice of pro bono and public interest law. *See Pro Bono Legal Work: For the Good of not only the Public, but also the Lawyer and the Legal Profession*, 91 Mich. L. Rev. 2122. Professor Strossen asserts that such work can help to counter negative attitudes towards the legal profession, noting that lawyers belong to one of the least popular professions in public opinion polls, and that trial lawyers typically fare the worst among all types of lawyers in such polls. Additionally, Professor Strossen

---

[1] From this verdict, it might well be that Mr. Shapiro proved that his constitutional rights had been violated, but fell short on proving by a preponderance of the evidence precisely which state actor was legally responsible for that violation.

observes that pro bono work can help shift negative attitudes among lawyers
themselves, explaining that surveys show that many lawyers feel a lack of self-esteem
and professional satisfaction as a result of public attitudes towards the profession, work
pressure, and financial pressure. "Nothing can do more to ennoble a lawyer's own
experience, and also to elevate the public perception of the legal profession, than some
involvement in public service work." *Id.* at 2135. Public service "[l]awyers can make
their profession a calling of the highest order, a way to pursue our society's highest
ideals: liberty, equality, and justice for all." *Id.*[2]

Third and most importantly, the public as a whole benefits incalculably from
lawyers' public service work. "There is a marvelous American tradition
of lawyers donating time to public service. This lawyers' pro bono tradition is one
aspect of the general pattern of active voluntarism in the United States. Many human
rights and other public interest causes have been won thanks to the generosity
of lawyers. . . . Many of our great cases - and many great landmarks of United States
constitutional law - were won by pro bono counsel." *Id.* at 2136. As Supreme Court
Justice Louis Brandeis observed more than a century ago:

> It is true that at the present time the lawyer does not hold that position
> with the people that he held seventy-five or even fifty years ago; but the
> reason is not lack of opportunity. It is this: Instead of holding a position of
> independence, between the wealthy and the people, prepared to curb the
> excesses of either, able lawyers have, to a large extent, allowed themselves

---

[2] Judges of this Court likewise frequently and quite properly expound on the importance of *pro bono publico* public
interest litigation, and encourage members of the federal court bar to take more such cases, for the betterment of the
profession and for the good of the public.

> to become adjuncts of great corporations and have neglected their
> obligation to use their powers for the protection of the people. We hear
> much of the "corporation lawyer," and far too little of the "people's
> lawyer."

Louis D. Brandeis, The Opportunity in the Law, Address Before the Harvard Ethical

Society (May 4, 1905), in 39 Am. L. Rev. 555, 555, 559 (1905). Justice Brandeis's words

still ring true today. Thus, Courts strongly encourage more lawyers to become involved

in the kinds of cases that Plaintiff's *pro bono* law clinic counsel volunteered (at the

request of a federal judge) to take on here. Law students[3] and recent law school

graduates are too commonly disillusioned by the disconnect between private law firms'

claimed commitments to pro bono service and the reality, which is that the opportunity

for public interest work is often very limited:

> Insightful student comments after interviews at law firms encouraged this
> exploration of public interest and pro bono culture. Shown walls of
> framed pro bono awards, one student noted a pervasive money culture in
> the rest of the work of the law firm where he interviewed. Another
> student at a callback interview was surprised by the disparity between the
> recruiters' pitch about the firm's valuing of pro bono and the subtly
> dismissive responses of other lawyers in the firm to her queries about
> volunteer opportunities. Students asking about meaning in the jobs for
> which they were interviewing were given stories of pro bono work and
> assured that up to one hundred hours per year of such work would be
> allowed. Yet those one hundred hours seemed meager indeed when the
> future lawyer reflected upon the two thousand billable hour requirement
> of the job. In the face of declining numbers of legal services, public
> defender, and non-profit law office jobs, a soon-to-be law graduate asked

---

[3] Mr. Shapiro was in this matter represented by a team of law students supervised by practicing civil rights practitioners and professors of law at a prominent law school. The imposition of attorney fees against the Plaintiff under this circumstance would have a uniquely chilling effect on the development of a robust public interest program and future public interest lawyers. There would be almost nothing but downside risk in taking a pro bono case, which would discourage enrolling in the clinical program at all for fear that the financial repercussions are simply too daunting.

> how he can find work that takes the common good to heart. While
> lamenting the dearth of jobs in the so-called "public interest" sector, the
> student reveals the professional culture that has taught him he cannot
> look for public interest work in private practice settings (other than
> volunteer work).

New Directions in Public Policy, Clinical Education, and Dispute Resolution: A Call to

Cultivate the Public Interest: Beyond Pro Bono, 51 Wash. U. J.L. & Pol'y 95, 98. In

response to interviews like these, Professor Juergens contends that "[t]wo changes in

professional culture are needed. First, bar leaders and law teachers ought to foster a

culture where lawyers are expected to work in the spirit of public service, even when

being paid in private practice. Law students should be taught that every lawyer is a

'public citizen with a special responsibility for the quality of justice,' not just in her

spare time after her regular (paying) work is done or when she lands a job funded by

the government or a non-profit." *Id*. at 99. "Second, professional culture must devise

ways for more lawyers to bend their entire practices to serve their communities,

including their members of modest means." *Id*. at 100.

> Public interest work for pay does survive as the focus in some private
> firms. This happens in two main ways: (1) some firms specialize in areas
> of law where work on behalf of individual clients also impacts the
> common good, such as plaintiffs' civil or employment rights firms; (2) and
> some community-based small firms orient their practices to address the
> justice needs of a community and its individuals in an affordable and
> collaborative way. These models of public-spirited law work - paid for by
> clients and by attorneys' fee awards - have receded from view within the
> profession. Ironically, over the last thirty-five years an increase in legal
> volunteer work has accompanied a gradual reframing of "public interest"
> in law work. The idea of public interest service has shrunk so that lawyers
> and most law-related institutions understand it either to be work done on
> a volunteer basis - pro bono work, given free to individuals or

> organizations with few resources - or work done by government attorneys and non-profit organizations, e.g., prosecutors, public defenders, legal services workers, and so forth. One result of the new framing of public interest is the virtual elimination of pressure within the profession to take the common good into account.

*Id*. at 100-101.

Professors and judges are hardly alone in pushing more lawyers to practice public interest law as part of their day-to-day work. In 2007, Congress passed and then-President George W. Bush signed the College Cost Reduction and Access Act, which cancels all remaining student debt for lawyers who have practiced public interest law for ten years. The law defines public interest law as "legal services provided by a public service organization that are funded in whole or in part by a local, State, Federal, or Tribal government." *See* 34 C.F.R. § 685.219.

Therefore, the private enforcement of civil rights laws is a public policy matter of paramount importance. Now more than ever, the legal profession needs more people doing exactly what Plaintiff's law student and legal clinic pro bono counsel did here, which is to seek to vindicate the constitutional rights of an indigent prisoner who could not afford to pay for counsel, and whose only realistic means of obtaining a remedy in court was through free legal representation. Plaintiff's legal claims were neither frivolous nor groundless nor vexatious nor maintained in bad faith. To the contrary, the Court denied multiple dispositive motions, including entirely denying Defendants' Rynek's and Doane's motion for summary judgment, holding that a jury might reasonably find based on the evidence that Plaintiff was in fact subjected to an

unconstitutional strip search. While Plaintiff ultimately did not prove his claims at trial

(though a jury did conclude he was strip searched),

> it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg Garment Co.*, 434 U.S. at 421-22.

Undersigned *amici* strongly urge that to award attorneys' fees against Mr.

Schapiro, who is indigent, or against volunteer law students and teachers at a law clinic,

as Defendants urge[4], in a case like the instant one would have profoundly harmful

effects for the practice of public interest law in at least the State of Colorado, and

potentially across the United States. In response to such a pernicious result,

organizations, attorneys and aspiring attorneys would be substantially chilled from

taking on civil rights cases – even compelling ones – because of the apparent risk of

losing after years of often-difficult and contentious litigation and being saddled with a

bill of hundreds of thousands of dollars. Civil rights cases often are inherently

---

[4] It is unclear precisely who the government wants to have to pay any award of attorney fees.  This uncertainty only intensifies the *in terrorem* effect of such a request, threatening to deter lawyers, clients and public interest organizations from taking cases that present a risk that the government will oppressively retaliate by inflicting severe financial burdens in the event the civil rights claimant loses her case.

challenging and risky, regardless of the underlying facts, frequently because of the identity of the plaintiff, such as a convicted prisoner, criminal suspect, or outspoken protestor who is challenging the *status quo* and may be pushing (but seemingly still within) the limits of free speech. Law students also would be discouraged from participating in law clinics and other public interest endeavors because of the perceived financial and reputational risk. Fewer law students would, in turn, be exposed to an educational, rewarding, and possibly eye-opening public interest law experience, and fewer would pursue careers in public interest law. That means fewer lawyers would have the experience, skills, and desire to take on some of the most challenging and consequential cases that exist in the legal profession – those involving violations of individual's civil rights and the United States Constitution.

   This result – the reduction in the frequency of civil rights challenges to unconstitutional governmental conduct, and the reduction in the number of legal advocates willing to shoulder the risks and burdens of spearheading such challenges – is exactly what the government seeks through its current motion for fees.  The motion is publicly made, and the Order of this Court will be widely known.  The ripple effect of an Order requiring the payment of hundreds of thousands of dollars will have frightening consequences.

   The supply of available legal assistance would be especially reduced for relatively powerless potential litigants like prisoners, and for litigants who are poor and unable to shoulder any of the costs of their case. The less vigorous enforcement of civil

rights would inevitably lead to more civil rights violations, would deepen racial, ethnic, religious, and economic schisms (among others), and would increase the power of those members of society who already wield the most power while further decreasing the power and freedom of the relatively powerless. This inequitable and anti-democratic result is intolerable.

Therefore, Defendants' demand for attorney's fees must not only be denied, it must be unequivocally condemned by the Court in light of the circumstances present here. Defendants seek an award of over $170,000 against law students, law professors, and an indigent man, all of whom fought hard and long, albeit ultimately unsuccessfully, in pursuit of the enforcement of core constitutional values of privacy and limitations on governmental power. The government's request is fundamentally contrary to sound public policy and threatens to undermine some of the most noble values that define the legal procession at its best, such as standing up for those who are wronged and are unable to vindicate their constitutional rights without public interest counsel representing them for no fee.

**2. AWARDING DEFENDANTS THEIR ATTORNEY'S FEES WILL HANDICAP CIVIL RIGHTS CLIENTS' ABILITY AND WILLINGNESS TO DEVELOP THE LAW ON IMPORTANT CIVIL RIGHTS ISSUES.**

The stringent standard for awarding attorney's fees pursuant to § 1988 to a prevailing defendant also reflects Congress's recognition that vindicating civil rights often involves the pursuit of creative and novel claims driven by a good-faith basis for reversing, extending or modifying existing law — particularly as applied to issues of

first impression under 42 U.S.C. § 1983 for deprivation of rights by government officials.

*See Eastway Constr. Corp. v. City of New York*, 637 F. Supp. 558, 575 (E.D.N.Y. 1986). The

district court in *Eastway Constr. Corp.* insightfully noted the critical role a system built

upon and encouraging private civil rights enforcement plays in ensuring our

constitutional values are continually adapted and strengthened:

> Some litigations should be, if not encouraged, at least not discouraged. Of particular importance are cases brought against government officials and government agencies. Such suits are often the only effective channel for keeping within bounds official arrogance and lawlessness. At the very least, they publicize grievances and thus permit the ventilation of private outrage that the First Amendment's right to petition protects. They serve the public policy of avoiding violence by providing a peaceful forum. They may provide the basis for legislative and executive ameliorative action even when the courts lack power to act. Many civil rights cases fall into this category.
>
> . . .
>
> Sometimes there are reasons to sue even when one cannot win. Bad court decisions much be challenged if they are to be overruled, but the early challenges are certainly hopeless. The first attorney to challenge *Plessy v. Ferguson* was certainly bringing a frivolous action, but his efforts and the efforts of others eventually led to *Brown v. Board of Education*. Similarly, the apparently useless challenges by attorneys of the still relatively recent Supreme Court decision in *Swain v. Alabama* have induced the Court to quickly reconsider and reject that ill-conceived ruling.

*Id.* at 575 (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)).

This has been the undersigned's experience as well. *Amici* have represented clients

pursuing good-faith claims for the extension or modification of civil rights law. As only

one example, only a few years ago it would likely have been characterized as

"frivolous" to challenge the pervasive legal prohibitions against gay marriage. The

legal solidity of such restrictions was unquestioned for generations. Nevertheless,

undersigned counsel (and others) persisted in challenging the constitutionality of such

restrictions on marriage equality, and cases such as *Burns et al. v. Hickenlooper*, Case No.

14-cv-1817-RM-KLM [5] (among others) presaged the United States Supreme Court's

opinion striking down such restrictions, as violative of the Equal Protection and Due

Process clauses of the Fourteenth Amendment to the United States Constitution.

*Obergefell v. Hodges*, 576 U.S. ___ (2015). Judicial hostility toward enforcement of

constitutional rights, even rights that are something less than well-established, or

through less-than-popular causes or litigants, coupled with the threat of financial ruin,

will undoubtedly significantly chill legitimate efforts to enforce the Constitution. This

result must be avoided, even at the cost of tolerating some cases that end up as

unavailing.

**3. STATE LAW SHOULD NOT INFLUENCE THIS COURT'S ASSESSMENT OF WHETHER OR NOT TO AWARD DEFENDANTS THEIR ATTORNEY'S FEES IN THIS FEDERAL CASE BASED ON VIOLATIONS OF FEDERAL LAW.**

Defendants ask this Court to slide down a slippery slope fraught with peril by

claiming that the Court should consult state law when determining whether to award

---

[5] Not surprisingly, the Colorado Attorney General's office, the same litigant that is seeking fees in the instant matter, stood stubbornly in opposition to this evolution of our civil rights laws as well.

them attorney's fees in this federal civil rights action. Courts have repeatedly made

clear that § 1983 is a separate and distinct remedy from state law. The federal judicial

forum was determined to be necessary to vindicate federal rights because, according to

Congress in 1871, state courts could not protect Fourteenth Amendment rights as a

result of their "prejudice, passion, neglect, [and] intolerance." *Monroe v. Pape*, 365 U.S.

167, 180 (1961), *rev'd on other grounds*, *Monell*, 436 U.S. 658.

In *Monroe*, the United States Supreme Court articulated three purposes for

passage of the statute – all predicated on the rejection of state law: (1) to "override

certain kinds of state laws"; (2) to provide "a remedy where state law was inadequate";

and  (3) "to provide a federal remedy where the state remedy, though adequate in

theory, was not available in practice." *Id*. at 173-74. Since deciding *Monroe*, the Supreme

Court's § 1983 jurisprudence has undergone a "steady expansion," including the

recognition of municipal liability claims in *Monell* and the availability of attorneys' fees

under 42 U.S.C. § 1988(b). *Hudson v. Michigan*, 126 S. Ct. 2159, 2167 (2006).

The Tenth Circuit has repeatedly declined to apply state law to § 1983 actions. *See*

*Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1108 n.12 (10th Cir. 2004), *rev'd on other*

*grounds*, 545 U.S. 748 (2005) (The Colorado Governmental Immunity Act "has

consistently been applied *only to* Colorado state tort law claims against government

officials even when the case also includes a § 1983 claim.") (emphasis added); *Berry v.*

*Muskogee*, 900 F.2d 1489, 1506-07 (10th Cir. 1990) (rejecting  state-law-based remedy to

be applied in  § 1983 death cases, instead fashioning a more expansive federal remedy);

*see also Rosa v. Cantrell*, 705 F.2d 1208, 1220-24 (10th Cir. 1982) (state law cannot prohibit § 1983 actions when § 1983 cause of action arises from decedent's death), *cert. denied,* 464 U.S. 821 (1983*); Sager v. Woodland Park*, 543 F. Supp. 282, 292-97 (D. Colo. 1982) (state law only may expand, not restrict, § 1983 remedies); *Larson v. Wind*, 542 F. Supp. 25, 26-27 (N.D. Ill. 1982) (state law cannot interfere with survival of § 1983 remedies when unconstitutional conduct causes death); *O'Conner v. Several Unknown Corral. Officers*, 523 F. Supp. 1345, 1347-49 (E.D. Va. 1981) (state law cannot deny recovery in § 1983 action for injuries deprivation of decedent's life causes). This is consistent with fundamental principles of federalism, whereby federal law is the supreme law of the land and preempts conflicting state law. U.S. CONST. ART. VI (Supremacy Clause). This concept is especially compelling when a governmental entity, as is happening here, requests a federal judge to rely upon state law in order to <u>punish</u> a civil rights litigant for an unsuccessful attempt at enforcing a federal constitutional right.  If resort to state law yields a result that further burdens or punishes a civil rights claimant, then it is inconsistent with the salutary and remedial purposes of Section 1983, and is preempted entirely by federal law.

Accordingly, the relevant standard here for attorneys' fees is that which applies to §§ 1983 & 1988 based on <u>federal law</u>. State law that in any way reduces the efficacy or accessibility of federal remedies – by, for instance, enabling a defendant to more easily obtain attorney's fees from a losing plaintiff – squarely conflicts with federal law and is thus preempted under the Supremacy Clause of the Constitution, and is null and void.

That is what C.R.S §§ 13-17-102 and 103 do here (at least according to Defendants'

apparent interpretation of those statutes, though in actuality, it is doubtful that these

state laws were intended to or do apply in this federal case based exclusively on

violations of federal law). C.R.S §§ 13-17-102 and 103 are preempted by the Supremacy

Clause to the United States Constitution to whatever extent they may apply to §§ 1983

and/or 1988 in any effort to burden a civil right claimant's effort to enforce his federal

rights. To hold otherwise would enable states to erode the fundamental civil rights

protections enumerated in countless federal laws. It also would promote the creation of

a patchwork of inconsistent remedies for the same civil rights violations depending on

the arbitrary factor of where the underlying case is litigated. This result is incorrect and

untenable as a matter of both law and policy.

### 4. DEMOCRACY DEMANDS THAT PREVAILING DEFENDANTS RECOVER ATTORNEY'S FEES FROM CIVIL RIGHTS PLAINTIFFS IN ONLY THE NARROWEST OF CIRCUMSTANCES.

Not only would an award of attorney's fees in this case be contrary to

Congressional intent, it would be blatantly undemocratic. Civil rights violators do not

typically discriminate against or injure the powerful; they much more frequently

oppress those perceived to be weak. They take advantage of the poor. They tyrannize

the vulnerable. Awarding attorney's fees to a prevailing defendant, particularly in a

case like this one, would be yet another instance of the powerful further entrenching the

marginalization of the poor. Democracy cannot support this. Our system was built to

resist it. *See generally Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718

(1967) ("In support of the American rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel.").   While an award of attorney fees against a well-financed institutional litigant might be inconvenient, a similarly-sized award against an individual, especially a poor person, could threaten bankruptcy or other financially devastating ruin[6].

Senior Judge Andre Davis of the Fourth Circuit Court of Appeals recently reminded us of the imperative of protecting and maintaining a system in which those perceived to be less powerful can still seek refuge in the Bill of Rights and the enforcement laws it inspired. In a concurring opinion regarding transgender rights, Judge Davis wrote of our nation's ongoing civil rights struggle and the burden on those who, in their quest to assert their humanity, stand up against and face the powerful:

> Our country has a long and ignominious history of discriminating against our most vulnerable and powerless. We have an equally long history, however, of brave individuals—Dred Scott, Fred Korematsu, Linda Brown, Mildred and Richard Loving, Edie Windsor, and Jim Obergefell, to name just a few—who refused to accept quietly

---

[6] Although defendants in this case are nominally individuals, they are completely indemnified by the State of Colorado for the costs of their defense.  Thus, their assertions in their Motion for Fees that Plaintiff "forced Defendants Rynek *and* Doane to bear the astronomical expense of briefing a dispositive motion and ultimately preparing for and presenting a defense at trial which included a slew of pretrial motions filed by Plaintiff and the preparation of two separate sets of defense witnesses on behalf of the co-Defendants," Motion at 6-7, does not comport with the financial realities of the situation.  These defendants did not pay a single penny in defense of their case, and thus these defendants did not bear any "astronomical expense."

> the injustices that were perpetuated against them. It is unsurprising, of course, that the burden of confronting and remedying injustice falls on the shoulders of the oppressed. These individuals looked to the federal courts to vindicate their claims to human dignity . . . as Dr. King reminded us, however, "the arc of the moral universe is long, but it bends toward justice."

*G.G. v. Gloucester Cty. Sch. Bd.*, No. 16-1733, Published Order (4th Cir. Apr. 7, 2017)

(Davis, J. concurring). And of the structural oppression our civil rights laws were built

to deconstruct—one hard-fought case at a time—Judge Davis wrote:

> [S]ome entities will not protect the rights of others unless compelled to do so. Today, hatred, intolerance, and discrimination persist—and are sometimes even promoted— but by challenging unjust policies rooted in invidious discrimination, G.G. takes his place among other modern-day human rights leaders who strive to ensure that, one day, equality will prevail, and that the core of dignity of every one of our brothers and sisters is respected by lawmakers and others who wield power over their lives.

*Id.*

## CONFERRAL

Undersigned counsel conferred with counsel of record for the parties regarding

their position on this *Amicus Curiae* brief.  Counsel for Plaintiff Shapiro has no objection

to the Court's consideration of this Brief.  Counsel for the State objects.

## CONCLUSION

Defendants, represented by the Colorado Office of the Attorney General, appear

to be using Mr. Shapiro's case to signal to civil rights plaintiffs, organizations and

lawyers in this state that if they lose, they will be vulnerable to staggering financial

penalties in the hundreds of thousands of dollars—enough to financially devastate the average Coloradan, not to mention an indigent prisoner. This tactic[7] subverts the primary objection of Congress's civil rights enforcement scheme. This Court should deny such a blatant attempt to undermine Congress's intent in enacting the statute under which they seek fees, and take this opportunity to clarify to Defendants, the Office of the Attorney General, and citizens of Colorado, that pursuing hundreds of thousands of dollars in attorney's fees against a plaintiff who courageously and doggedly pursued his civil rights claim through trial threatens the very foundation on which our most treasured constitutional and civil rights are built.

For the foregoing reasons, the undersigned *amici* request that this Court accept and consider the Proposed *Amicus* Brief and deny Defendants' motion for attorney's fees.

Respectfully submitted this 21st day of April 2017.

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*
Darold W. Killmer
Michael P. Fairhurst
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dkillmer@kln-law.com
mfairhurst@kln-law.com

---

[7] Regardless of the outcome of the Motion, the very filing of it has a significant chilling effect. When the Court denies the motion, amici request that the denial be forceful and pointed, to "chill" the Colorado Attorney General's office from such oppressive and retaliatory litigation tactics in the future.

*Attorneys for Amici Civil Rights Organizations and Lawyers*

## Organizational Signatories

American Civil Liberties Union of
    Colorado
Colorado Trial Lawyers Association
Civil Rights Education and Enforcement
    Center
Colorado Cross Disability Coalition
Lawyers Civil Rights Coalition

## Individual Lawyer Signatories

Seth Benezra
Nelson Boyle
Liz Castle
Alan Chen
Elizabeth A. Comeaux
Robert Connelly
Matthew Cron
John A. Culver
Eudoxie (Dunia) Dickey
Rachel Ellis
Iris Eytan
Michael P. Fairhurst
Lauren D. Fontana
Rachel Graves
Steven Hirschey
Arash Jahanian
David Lane
Ben Lebsack
M. David Lindsey
Mary Jo Lowrey
Justin Marceau
Matthew Scott Martin
Paul Maxon

Luke McConnell
Andy McNulty
Thomas D. Neville
David H. Miller
Andrea Mohamedbhai
Qusair Mohamedbhai
Andrew C. Montoya
Sara Neel
Mari Newman
Liana Orshan
Sarah Parady
Siddhartha Rathod
Daniel Recht
Mike Rosenberg
Jeri D. Shepherd
Phyllis Roestenberg
Jacqueline St. Joan (License Inactive)
Rebecca Wallace
Elizabeth Wang
Zachary Warren
Eleanor Wedum
Kevin Williams
Laura Wolf

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this April 21, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send electronic notification to the following:

Jacquelynn Rich Fredericks
Jacquelynn.richfredericks@coag.gov

Kristin Ruiz
Kristin.ruiz@coag.gov

Kathryn Starnella
Kathryn.starnella@coag.gov
*Counsel for Defendants*

Danielle C. Jefferis
djefferis@law.du.edu

Nicole B. Godfrey
Ngodfrey@law.du.edu
*Counsel for Plaintiffs*

s/ Jamie Akard
Jamie Akard